PPG INDUSTRIES, INC., Plaintiff,

v.

UNITED STATES of America,
Defendant,

and

Vitro Flotado, S.A. and Vidrio Plano de
Mexico, S.A., Defendant–Intervenors.

Court No. 90–03–00127.

United States Court of
International Trade.

March 5, 1992.

Stewart and Stewart (Eugene L. Stewart,
Terence P. Stewart, David Scott Nance,

and Amy S. Dwyer on the briefs, James R. Cannon, Jr., at oral argument), Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Jane E. Meehan and A. David Lafer, Diane M. McDevitt, of counsel, Atty.-Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Brownstein, Zeidman, and Schomer, Irwin P. Altschuler, David R. Amerine, and Claudia G. Pasche, Washington, D.C., for defendant-intervenors.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

Plaintiff PPG Industries, Inc. ("PPG") moves pursuant to Rule 56.1 of the Rules of this Court for judgment upon the agency record. The motion challenges several aspects of the final determination of International Trade Administration, United States Department of Commerce ("ITA" or "Commerce") in the second administrative review of the suspension agreement covering unprocessed float glass from Mexico. *Unprocessed Float Glass from Mexico; Final Results of Countervailing Duty Administrative Review*, 55 Fed.Reg. 5,870 (1990) ("*Final Results*"). The review covered shipments of the subject merchandise [1] entered during the period January 1, 1986, through December 31, 1986. The review covered two exporters, Vidrio Plano de Mexico, S.A. and Vitro Flotado, S.A. (hereinafter referred to individually as Vidrio Plano and Vitro Flotado, or collectively as "the signatories" or "Defendant–Intervenors"), the signatories to the suspension agreement.

*Background*

On February 28, 1984, the ITA published an agreement suspending a countervailing duty investigation on unprocessed float glass from Mexico. *Unprocessed Float Glass from Mexico; Suspension of Countervailing Duty Investigation*, 49 Fed. Reg. 7,264, 7,267 (1984). ("*Suspension Agreement*").[2] Thereafter, Commerce conducted the first administrative review covering the period February 1, 1984, through December 31, 1985; on December 10, 1986, Commerce determined that the signatories had complied with the terms of the suspension agreement. *Unprocessed Float Glass from Mexico; Final Results of Countervailing Duty Administrative Review*, 51 Fed.Reg. 44,503 (1986) ("*First Administrative Review*"). This Court sustained Commerce's determination in the 1984–85 administrative review in *PPG Indus., Inc. v. United States*, 13 CIT 297, 712 F.Supp. 195 (1989), *appeal docketed*, No. 89–1520 (Fed.Cir. June 1, 1989) ("*PPG II*").

On February 27, 1987, the Government of Mexico requested a second administrative review in accordance with 19 C.F.R. § 355.10 (1987), and also requested termination of the suspended investigation in accordance with 19 C.F.R. § 355.42 (1987). On December 30, 1988, Commerce published the preliminary results of its second administrative review of the suspension agreement and tentative determination to terminate the suspended investigation. *Unprocessed Float Glass from Mexico; Preliminary Results of Countervailing Duty Administrative Review and Tentative Determination to Terminate Suspension Agreement*, 53 Fed.Reg. 53,045–47 (1988) ("*Preliminary Results*").[3] The final results of this administrative review

---

**1.** The subject merchandise is "a type of flat glass produced by floating molten glass over a bed of molten tin." *Final Results*, 55 Fed.Reg. at 5,870.

**2.** In return for a suspended investigation, the defendant-intervenors entered into a suspension agreement under which they agreed "to renounce completely all benefits provided by the government of Mexico which [Commerce finds] to constitute bounties or grants on float glass

exported to the United States." *Suspension Agreement*, 49 Fed.Reg. at 7,264.

**3.** According to the Defendant, Commerce mistakenly referred to its tentative determination to terminate the suspended investigation pursuant to 19 C.F.R. § 355.42 (1988), as a tentative determination to terminate the suspension *agreement* in the preliminary results. *Preliminary Results*, 53 Fed.Reg. at 53,045.

were published on February 20, 1990, and are the subject of this action.

Plaintiff contends that the following aspects of Commerce's final determination are not based upon substantial evidence on the record and are not in accordance with law: (1) exports of unprocessed float glass had not benefitted from the payment of CEDIs; (2) the duty drawback program's rebates for import duties were not excessive; (3) the Mexican government had not exercised discretion in allowing specific companies to provisionally enroll debt in FICORCA;[4] (4) the Mexican government had not exercised discretion in allowing the enrollment of non-bank debt in FICORCA; (5) no countervailable benefit accrued to Mexican firms that converted FICORCA debt into floating-rate notes and there was insufficient evidence that the Mexican government exercised discretion by preselecting firms for the conversion; (6) FICORCA benefits were not countervailable as a general matter; and (7) the signatories complied with the terms of the suspension agreement and thus the suspended investigation should be terminated. *Plaintiff's Memorandum in Support of Motion for Judgment on the Agency Record ("Plaintiff's Brief")* at 1–2.[5]

Defendant, United States, asks this Court to dismiss Plaintiff's motion and sustain Commerce's final results as based upon substantial evidence on the record and as otherwise in accordance with law.

### Discussion

Commerce's determination must be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

Commerce's interpretations of the countervailing duty laws are accorded substantial deference and will be upheld as in accordance with law unless the interpretation is " 'unreasonable and plainly inconsistent with the statute, and ... unless weighty reasons require otherwise.' " *ICC Indus., Inc. v. United States*, 5 Fed.Cir. (T) 78, 84, 812 F.2d 694, 699 (1987) (quoting *Melamine Chem., Inc. v. United States*, 2 Fed.Cir. (T) 57, 60–61, 732 F.2d 924, 928 (1984)). Commerce's " 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.' " *ICC Indus.*, 5 Fed.Cir. (T) at 85, 812 F.2d at 699 (quoting *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.*, 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985) (emphasis in original)).

### 1. The CEDI Program

■ Commerce verified that the signatories to the suspension agreement had not received countervailable CEDIs directly and made the following determination:

> The signatories to the suspension agreement accounted for more than 90 percent of the float glass exports to the United States during the period of review. We verified that the signatories did not receive CEDIs directly on the exports of float glass to the United States.

*Final Results*, 55 Fed.Reg. at 5,873. Plaintiff challenges this determination as

---

4. The Fund for Coverage of Exchange Risks ("FICORCA") is a trust fund established by the Mexican government and the Bank of Mexico to help companies refinance foreign debt. *See PPG II*, 13 CIT at 298 n. 2, 712 F.Supp. at 196–97 n. 2.

5. In its brief-in-chief, Plaintiff also challenged Commerce's determination that the Mexican natural gas program was not countervailable. Subsequent to the filing of Plaintiff's brief-in-chief, the Court of Appeals for the Federal Circuit in its decision in the appeal of *PPG Indus., Inc. v. United States*, 11 CIT 344, 662 F.Supp. 258 (1987), *aff'd*, 928 F.2d 1568 (Fed.Cir.1991) ("*PPG I*"), resolved the issue of countervailability of the Mexican natural gas pricing policies, holding that those policies do not confer countervailable benefits. *PPG Indus.*, 928 F.2d at 1578–79. Plaintiff recognizes this in its reply brief, and abandons its original challenge in this regard.

unsupported by substantial evidence on the record.

In the first administrative review of the suspension agreement covering 1984 through 1985, Commerce found that the signatories to the suspension agreement, Vitro Flotado and Vidrio Plano, had not received countervailable benefits from CEDIs. *First Administrative Review*, 51 Fed.Reg. at 44,504. As noted earlier, that determination was upheld by this Court in *PPG II*, 13 CIT at 304, 712 F.Supp. at 201. During the second administrative review, as in the first, Plaintiff requested that Commerce investigate not only the possible direct receipt of CEDIs by the signatories, but also whether any company related to Vitro, S.A., the corporate parent of Vitro Flotado and Vidrio Plano, had received CEDIs. A.R.Doc. 15 at 2.[6]

Plaintiff contends that in the instant administrative review Commerce had before it "a great deal of information regarding the [CEDI] program not before the court in *PPG II*[.]" *Plaintiff's Brief* at 15. A good portion of Plaintiff's argument that the signatories might have received countervailable benefits from the CEDI program rests upon an assumption that the Mexican government had previously misled Commerce regarding the status of the CEDI program—particularly, Plaintiff's assertion that "CEDIs had been paid after the alleged suspension of the program in 1982." *Plaintiff's Brief* at 17.

Because there appears to be some confusion regarding the 1982 suspension of the CEDI program, the Court finds it useful to clarify certain aspects of the program.

The CEDI program apparently contains more than one component. The acronym "CEDI" (Certificado de Devolucion de Impuesto) refers to a tax credit intended to rebate indirect taxes incurred during the manufacturing process of a product which is ultimately exported. *See* A.R.Doc. 31 at 5–6; *see also* A.R.Doc. 22 at 6. This portion of the CEDI program was discontinued by the Mexican government as of August 26, 1982; the CEDI program itself was not eliminated. A.R.Doc. 31 at 6.

The Court notes that part of the evidence relied upon by Plaintiff was submitted to ITA during the 1984–85 administrative review; this evidence, however, does not establish that the signatories received CEDI benefits at any time during the instant review covering 1986.[7] The only new or additional information ITA received during the 1986 review consists of two documents—The 1986 Economic Report of the Government of Mexico, the official report of the President of Mexico ("Presidential Report") reflecting continued payments of CEDIs after 1982 and the 1986 annual report for the Vitro group, which allegedly indicates that it received CEDI benefits. A.R.Doc. 16 at 2–3.[8] As discussed below, this evidence does not persuade the Court that the signatories received countervailable CEDI benefits during the period of review.

In its questionnaire response, the Mexican government stated that the particular CEDI which covers "the return of various taxes" was terminated on August 25, 1982. With respect to the 1986 Presidential Report showing the payment of CEDIs after 1982, the Mexican government explained that the document refers to the tax rebate which was available for exports made before August 25, 1982; and while some rebate certificates were issued after 1982, "they always were for exports made before August 25, 1982." A.R.Doc. 22 at 6. Ac-

---

6. The public version of the administrative record in this case will be referred to as "A.R.Doc.".

7. For example, Plaintiff refers this Court to a Mexican Securities Commission report which was submitted to Commerce during the 1984–85 float glass review. *See* A.R.Doc. 15 at 3. The report allegedly demonstrates that Vidrio Plano violated the suspension agreement by receiving CEDI benefits after signing the agreement in 1984. This report, however, does not relate to the receipt of CEDI benefits alleged in this action. The report states that the recipients received duty drawback paid in the *form* of a CEDI, a program that Commerce has not investigated. The duty drawback program is discussed elsewhere in this opinion.

8. The Vitro group apparently consists of a number of companies, two of which are the signatories. *See* A.R.Doc. 31 at 7.

cording to the Mexican government, the Presidential Report indicates that no tax rebate CEDIs were issued in 1986. *Id.*

At verification, the ITA conducted a thorough inquiry into the possible receipt of CEDIs by the signatories. After reviewing various government reports and computer printouts, ITA determined that neither of the signatories, which accounted for over 90% of float glass exports to the United States, received CEDI benefits during 1986. A.R.Doc. 31 at 5–9. Commerce reconfirmed this finding after it reviewed Vidrio Plano's and Vitro Flotado's accounting records and federal tax returns for 1986. *Id.* at 17, 22. Consequently, this Court concludes that Commerce's determination that the signatories received no direct, countervailable CEDIs during 1986 is supported by substantial evidence on the record and otherwise in accordance with law.

The Court notes that during verification Commerce discovered that Vidrio Plano had received a single CEDI, which was actually granted in 1985, but was recorded on Vidrio's 1986 tax return. A.R.Doc. 31 at 16–17. This CEDI, however, was for duty drawback granted in 1985 and not for *indirect taxes;* Customs found no evidence at verification that any federal taxes were paid with CEDIs by Vidrio Plano. *Id.* at 17. As the Court explained above, the Mexican government's suspension of CEDI payments on August 25, 1982, was limited to that aspect of the CEDI program concerning the rebate of indirect taxes. The verification report indicates that "[i]mport duty rebates, or duty drawback, continued to be paid in the form of a CEDI after August 1982 and up to April 1985, when duty drawback began to be paid only by check. All manufactured products were eligible for duty drawback both before and after August 1982." *Id.* at 6. Plaintiff has put forth no evidence that the receipt of duty drawback by Vidrio Plano, which took the form of a single CEDI, granted in 1985 and recorded in 1986, amounted to a countervailable benefit during the period of review.

As to Plaintiff's concern that the receipt of CEDIs by other companies or export consortia might have passed through to the signatories, Commerce

> verified that no float glass was exported to the United States through export consortia during the period of review. With respect to PPG's concern of possible indirect benefits, CEDIs are earned on a shipment-specific basis and are not transferable; any benefits received from them can only be used by the exporting company.

*Final Results,* 55 Fed.Reg. at 5,873. Commerce verified that the signatories exported their merchandise directly to the United States and not through export consortia. A.R.Doc. 31 at 14, 20. Moreover, Commerce was informed at verification that no CEDIs were paid to foreign trade consortia for exports in 1986. *Id.* at 9. Given these findings, this Court holds that Commerce reasonably determined that float glass exports to the United States did not receive indirect countervailable benefits during the 1986 review.

2. *Duty Drawback Program*

■ With respect to the duty drawback program, Commerce made the following determination.

> Duty drawback, by definition, is the rebate on duties paid on imported goods that are physically incorporated in an exported product; it is a practice acceptable under U.S. countervailing duty law and the GATT, and does not give rise to a subsidy unless the drawback is in excess of the duties levied on physically-incorporated goods. The Department had no basis to believe or suspect that the duty drawback was excessive or that the program was improperly administered.

*Final Results,* 55 Fed.Reg. at 5,874. Plaintiff challenges Commerce's determination that the duty drawback received by the signatories was not excessive. Plaintiff contends that because Commerce never obtained complete information regarding the program's operation, the record contains no evidence that duty drawback payments were not excessive.

Commerce did in fact examine whether the signatories received duty drawback. In its supplemental questionnaire of January 4, 1988, Commerce asked the Mexican government a series of questions concerning duty drawback. Commerce verified that Vidrio Plano received duty drawback in a very small amount during 1986. A.R.Doc. 31 at 16–17. This amount was paid in the form of a CEDI for drawback granted in 1985, but received by Vidrio Plano in 1986. *Id.* at 17. Commerce examined Vitro Flotado's accounting and tax records for the 1986 review period and verified that it had not received any import duty drawback. *Id.* at 22. In any event, Plaintiff has not put forth any evidence indicating that the duty drawback might have been excessive. In light of such bare allegations, Commerce properly declined to initiate a large scale investigation of the duty drawback program.

### 3. *FICORCA*

■ In its final results in this administrative review, Commerce determined that it was not necessary to reinvestigate the FICORCA program during the 1986 review because it had previously found the program to be non-countervailable. Commerce rested its determination upon numerous previous determinations and court decisions affirming those determinations and upon the fact that Plaintiff produced no new significant evidence to call those previous determinations into question. *Final Results*, 55 Fed.Reg. at 5,871.[9]

Nevertheless, Plaintiff requests this Court to reconsider its previous decisions.

The Court declines to do so. This Court has held that "Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination" in the absence of sufficient new evidence presented. *PPG Indus., Inc. v. United States*, 14 CIT ——, 746 F.Supp. 119, 135 (1990); *see Can–Am Corp. v. United States*, 11 CIT 424, 429, 664 F.Supp. 1444, 1449 (1987). As discussed below, Commerce acted reasonably in declining to reinvestigate FICORCA in the absence of new and sufficient evidence on the record.[10]

Plaintiff contends that it submitted new information to Commerce in the instant administrative review which required Commerce to reevaluate its previous determinations that the FICORCA program is not countervailable. This "new" information is essentially the same as that submitted to Commerce by Plaintiff during the 1984–85 float glass review in support of Plaintiff's argument that the Mexican government exercised discretion in administering FICORCA.

Plaintiff contends that the Mexican government may have exercised discretion in its administration of the FICORCA program and, therefore, could have allocated benefits to specific enterprises. According to Plaintiff, the Mexican government used discretion to channel FICORCA benefits to specific companies not otherwise eligible to receive them by allowing (1) the provisional enrollment of unrescheduled debt in FICORCA; (2) the enrollment of non-bank

9. *See Unprocessed Float Glass from Mexico; Countervailing Duty Determination*, 49 Fed.Reg. 23,097, 23,099 (1984); *Unprocessed Float Glass from Mexico; Preliminary Results of Countervailing Duty Administrative Review*, 51 Fed.Reg. 37,319, 37,320–21 (1986); *First Administrative Review*, 51 Fed.Reg. at 44,504; *PPG I*, 11 CIT at 349–54, 662 F.Supp. at 263–67; *PPG II*, 13 CIT at 302–04, 712 F.Supp. at 199–201.

10. In *PPG Indus., Inc. v. United States*, 928 F.2d 1568 (Fed.Cir.1991), the Court of Appeals sustained this Court's decision in *PPG I* which upheld Commerce's determination that FICORCA did not confer countervailable benefits on float glass producers. Because the challenged determination in this case is the same as the challenged determination underlying the appellate court's decision, Defendant urges that this Court sustain it in accordance with principals of *stare decisis*. While this Court is reluctant to apply such broad principles in countervailing duty and antidumping cases, where Congress has made specific provisions for periodic administrative reviews, *see* 19 U.S.C. § 1675(a) (1988), no legitimate purpose is served by expending judicial resources in reviewing a government program found not countervailable in previous administrative reviews affirmed by this Court in the absence of some compelling new information of record that casts doubt upon the correctness of those decisions.

debt in FICORCA; and (3) the conversion of FICORCA debt into floating-rate notes.

Commerce responded to these arguments as follows:

PPG requested that the [Commerce] Department evaluate aspects of the FICORCA program that allegedly presented "new" information and/or changes to existing FICORCA regulations. We verified that the alleged new features or changes to FICORCA programs were provided for in the original FICORCA regulations. Contarry [sic] to PPG's assertion, the FICORCA regulations have been on the record since the original investigation in this case, and are also a part of the record in this review.

It is clear from the regulations that FICORCA was not intended solely for bank debt because Mexican firms having indebtedness denominated in a foreign currenty [sic] and payable abroad to foreign financial entities, or suppliers, could participate in the FICORCA program. Thus, no special approval was required for non-bank debt. With respect to the provisional enrollment of unrescheduled debt, we discussed this fully in the preliminary results of this review....

. . . .

We verified that the signatories to the suspension agreement did not convert FICORCA liabilities into floating rate notes.

*Final Results*, 55 Fed.Reg. at 5,871–72.

Almost nothing argued by Plaintiff in this action with respect to FICORCA is new to this Court. Moreover, the arguments advanced by Plaintiff in this action concerning the so-called discretionary allocation of FICORCA benefits, as well as the evidence relied upon, are essentially identical to those advanced by PPG in another action recently decided by this Court. *PPG Indus., Inc. v. United States*, 15 CIT ——, 781 F.Supp. 781 (1991). In that case, which concerned fabricated automotive glass from Mexico, the Court dismissed PPG's claims that the Mexican government exercised discretion in administering the FICORCA program which might have resulted in countervailable benefits being conferred upon Mexican automotive glass producers.

Plaintiff's reassertion here that the Mexican government allowed specific companies to enroll debt "provisionally" in FICORCA, when that debt should first have been rescheduled to become long-term debt, is no more persuasive now than it was in *PPG II*, which sustained ITA's findings in the 1984–85 review covering the suspension agreement as supported by substantial evidence on the record and otherwise in accordance with law. *PPG II*, 13 CIT at 302–305, 712 F.Supp. at 199–201. The Court again notes that much of the evidence relied upon by Plaintiff was before Commerce in the 1984–85 review. In that review, Commerce was apparently unpersuaded by this evidence and chose not to reevaluate FICORCA, instead adopting the rationale used in the preliminary results.

At verification in the instant case, Commerce rejected Plaintiff's argument that the so-called "provisional enrollment" of unrescheduled debt in FICORCA was a new feature of FICORCA demonstrating that the Mexican government exercised discretion as to which firms could enroll unrescheduled debt into FICORCA. Commerce explained that the firms which were otherwise entitled to enroll debt in FICORCA and whose debt was in the rescheduling process were permitted to enroll in FICORCA despite the fact that the FICORCA contracts were not yet underwritten. *See* A.R.Doc. 31 at 12–13; *Preliminary Results*, 53 Fed.Reg. at 53,046; *see also PPG Indus.*, 15 CIT at —— – ——, 781 F.Supp. at 786, 787. Plaintiff has apparently presented no evidence that the Mexican government permitted select companies who were otherwise ineligible for FICORCA to enroll debt prior to concluding FICORCA negotiations. Consequently, this Court can find no reason to disturb Commerce's conclusions in this regard and, therefore, sustains its determination as supported by substantial evidence on the record and as otherwise in accordance with law.

Plaintiff's position is equally flawed with respect to its remaining arguments that the

Mexican government improperly pre-selected firms to enroll non-bank debt in FICORCA and convert FICORCA debt into floating-rate notes.

As noted, Commerce determined that no special approval was required to enroll non-bank debt (such as commercial paper) in the FICORCA program. *Final Results*, 55 Fed.Reg. at 5,872; *see PPG II*, 13 CIT at 302–04, 712 F.Supp. at 199–201 (ITA explaining that Mexican firms with registered debt denominated in a foreign currency and payable abroad to foreign financial entities *or suppliers* are entitled to participate in FICORCA); *see also PPG Indus.*, 15 CIT at ——–——, 781 F.Supp. at 787–788.

Plaintiff's claim that the Mexican government exercised discretion by granting special permission to certain firms to convert FICORCA debt into floating-rate notes which were not subject to the regular 15 percent withholding tax on interest payments in Mexico is equally without merit. Commerce verified that the signatories to the suspension agreement did not convert FICORCA debt into floating-rate notes during the review period. In any event, it appears from the verification report that exemption of floating-rate notes from withholding tax is part of the Mexican tax law, not part of the FICORCA program, in part because the feature applies to all foreign loans, not just FICORCA loans:

> FICORCA debt itself has no special tax liability and ... interest income from FICORCA debt is subject to the same tax provisions as all other interest income. FICORCA does not authorize the issuance of floating rate notes. Firms are free to negotiate with their creditors the type of notes they obtain.

A.R.Doc. 31 at 13. While Commerce found that some of the debt enrolled in FICORCA by Vitro consisted of floating-rate notes, Commerce concluded that no countervailable benefit was gained by such a conversion because the interest rate that would be paid for the fixed-rate loans and float-

rate loans were identical. The only difference between the two is that with the fixed-rate loans, 85 percent of the interest is paid to the foreign bank and the remaining 15 percent is payable to the Mexican government on behalf of the foreign bank, while with floating-rate notes, all of the interest is paid to the foreign bank. A.R.Doc. 31 at 13.

Because Plaintiff has failed to show that the enrollment of non-bank debt into FICORCA or the conversion of FICORCA debt into floating-rate notes were discretionary acts by the Mexican government in contravention of the FICORCA regulations, Commerce's determination is upheld as supported by substantial evidence on the record and otherwise in accordance with law.

### 4. *ITA Properly Determined to Tentatively Terminate the Suspended Investigation*

■ In the *Preliminary Results*, Commerce determined that the signatories to the suspension agreement had complied with the terms of that agreement during the 1986 review period. *Preliminary Results*, 53 Fed.Reg. at 53,045. Because the signatories complied with the terms of the suspension agreement for more than two years and the signatories agreed, in writing, to an immediate suspension of liquidation and a continuation of the investigation in the event of the receipt of subsidies in the future, Commerce tentatively determined to terminate the suspended investigation pursuant to 19 C.F.R. § 355.42(e) (1988). *Id.* at 53,047. Commerce affirmed its preliminary determination in the final results. *Final Results*, 55 Fed.Reg. at 5,874.[11] For the reasons that follow, this Court holds that Commerce's final determination was based upon substantial evidence on the record and was otherwise in accordance with law.

---

**11.** Noting that the provisions of 19 C.F.R. § 355.42(e) (1988) governed any termination of the suspended investigation, Commerce stated that any such termination would not become effective until the completion of next adminis-

trative review covering the periods January 1, 1987, through December 30, 1988 (the date of the publication of the preliminary results). *Preliminary Results*, 53 Fed.Reg. at 53,047; *Final Results*, 55 Fed.Reg. at 5,874.

Commerce may terminate an investigation if it is demonstrated that "the production, manufacture, or exportation of the merchandise has been without benefit of a net subsidy for at least a two-year period following the date of publication in the Federal Register of a Countervailing Duty Order or notice of suspension of investigation." 19 C.F.R. § 355.42(b). Under the suspension agreement in the instant case, the signatories agreed to renounce all countervailable subsidies bestowed upon unprocessed float glass that they produced and exported, directly or indirectly, to the United States. *Suspension Agreement*, 49 Fed.Reg. at 7,267. Because Commerce has properly determined that the signatories have fully complied with the suspension agreement for two years, its action was proper under 19 C.F.R. § 355.42(e) (1988).

However, Plaintiff argues that the suspension agreement itself must be terminated and a countervailing duty order issued instead because the suspension agreement fails to satisfy certain requirements contained in subsections (b) and (d) of 19 U.S.C. § 1671c (1988),[12] to wit, that (1) the agreement is incomplete because it does not specifically prohibit the receipt of countervailable benefits from the FICORCA program, (2) Commerce is unable to determine whether the signatories received CEDI benefits from export consortia, and (3) Commerce cannot effectively monitor compliance.

Plaintiff's concern that the terms of the suspension agreement do not explicitly prohibit the receipt of countervailable benefits from the FICORCA program overlooks the broad scope of the suspension agreement itself. Under section B(5) of the suspension agreement, the signatories are prohibited from receiving benefits, directly or indirectly, under *any* other program subsequently found by ITA to constitute countervailable bounties or grants. *Suspension Agreement*, 49 Fed.Reg. at 7,267. In any event, this Court has upheld Commerce's determination that the signatories received *no* countervailable benefits in contravention of the suspension agreement in the 1986 review.

Further, it appears from the verification report that Commerce has effectively and thoroughly monitored the suspension agreement. Therefore, Commerce's determination to tentatively terminate the suspended investigation is upheld as supported by substantial evidence on the record and otherwise in accordance with law.

### Conclusion

Based upon the foregoing, Plaintiff's motion for judgment upon the agency record is denied. Commerce's final results are sustained in their entirety. The action is dismissed.

---

**12.** Those subsections provide, in relevant part:

(b) **Agreements to eliminate or offset completely a subsidy or to cease exports of subsidized merchandise**

The administering authority may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—

(1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or

(2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.

. . . .

(d) **Additional rules and conditions**

(1) **Public interest; monitoring**

The administering authority shall not accept an agreement under subsection (b) or (c) of this section unless—

(A) it is satisfied that suspension of the investigation is in the public interest, and

(B) effective monitoring of the agreement by the United States is practicable.