Slip-Op. 01-38

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  CHIEF JUDGE GREGORY W. CARMAN

_____
                                                  :
**BETHLEHEM STEEL CORPORATION,** *et al.,*  :
                                                  :
            **Plaintiffs,**                       :
                                                  :
                  **v.**                          :          **Court No: 00-03-00116**
                                                  :
**UNITED STATES,**                                :
                                                  :
            **Defendant,**                        :
                                                  :
**POHANG IRON & STEEL CO.,**                      :
                                                  :
            **Defendant-Intervenor.**             :
_____:


[Plaintiffs' Motion for Judgment on the Agency Record is granted in part and denied in part. Commerce's *Final Determination* is remanded in part for further action.]

    *Dewey Ballantine LLP.* (John Ragosta, Jennifer Danner Riccardi, Navin Joneja), Washington, D.C., for Plaintiffs.

    *Stuart E. Schiffer*, Deputy Assistant Attorney General of the United States; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, Department of Justice; *A. David Lafer*, Senior Trial Counsel, International Trade Section, Civil Division, United States Department of Justice; *William L. Olsen*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Cindy Buys*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, Washington D.C., for Defendant.

    *Kaye, Scholer, Fierman, Hays & Handler* (Donald B. Cameron, Julie C. Mendoza, Brady W. Mills), Washington, D.C., for Defendant-Intervenor.


Dated: April 4, 2001

<strong>OPINION</strong>

**CARMAN, CHIEF JUDGE:** This action is before the Court on Bethlehem Steel Corporation

(Bethlehem Steel) and U.S. Steel Corporation's (U.S. Steel) (collectively, Plaintiffs) Rule 56.2

Motion for Judgment on the Agency Record. At issue are several elements of the final and

amended determinations in *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic*

*of Korea*, 64 Fed. Reg. 73,176 (Dep't Commerce 1999) (*Final Determination*), *Certain Cut-to-*

*Length Carbon-Quality Steel Plate from the Republic of Korea*, 65 Fed. Reg. 6,587 (Dep't

Commerce 1999) (*Amended Determination*). The Court has jurisdiction over this matter

pursuant to 28 U.S.C. §1581(c). The following sections provide an overview of the facts and

events precipitating this action, as well as the contentions put forth by the parties.

<strong>BACKGROUND</strong>

On February 16, 1999, Plaintiffs and certain other domestic producers of cut-to-length

steel plate products filed a countervailing duty petition alleging that manufacturers, producers,

and exporters of subject merchandise from the Republic of Korea received countervailable

subsidies within the meaning of 19 U.S.C. § 1671 (1994). Both the United States International

Trade Commission (ITC) and the United States Department of Commerce (Commerce)

investigated the allegations for subject merchandise imported during calendar year 1998. *See*

*Final Determination*, 64 Fed. Reg. at 73,177. On April 8, 1999, the ITC determined that the

United States' domestic industry was being materially injured or threatened with material injury

by imports of subject merchandise from Korea. *See Certain Cut-to-Length Steel Plate from the*

*Czech Republic, France, India, Indonesia, Italy, Japan, Korea, and Macedonia*, 64 Fed. Reg.

17,198 (Int'l Trade Comm., April 8, 1999). On July 29, 1999, Commerce preliminarily

determined that certain Korean producers of subject merchandise had received countervailable subsidies.  Commerce issued its final determination on December 29, 1999, and on February 10, 2000, issued an amended determination setting countervailable duty rates at 0.82% *ad valorem* for the Pohang Iron Steel Company (POSCO or Defendant-Intervenor) and 3.26% *ad valorem* for Dongkuk Steel Mill Co. (DSM).  *See Amended Determination*, 65 Fed. Reg. at 6,587.  Additionally, Commerce set 3.26% as the "all others" rate for companies not party to its investigation.  *See id.*

On March 10, 2000, Bethlehem Steel and U.S. Steel filed a summons with this Court initiating suit.[1]  In their complaint, Plaintiffs allege several causes of action that can be divided into three distinct claims.[2]  Specifically, Plaintiffs allege: (1) Commerce's failure to investigate certain potentially countervailable subsidies renders the *Final Determination* unsupported by substantial evidence and not in accordance with law; (2) Commerce's failure to explicitly address certain issues raised by the parties during the course of its investigation renders the *Final Determination* unsupported by substantial evidence and not in accordance with law; and (3) Commerce's conclusion that the Voluntary Curtailment Adjustment (VCA) program did not confer a specific benefit is unsupported by substantial evidence and not in accordance with law. (Bethlehem Steel Corporation's and U.S. Steel Group, A Unit of USX Corporation's Rule 56.2 Motion for Judgment on the Agency Record, at 2-3) (Plaintiffs' Brief).  The United States and the Defendant-Intervenor oppose Plaintiffs' motion.

---

[1] The action filed by Plaintiffs was originally consolidated under CIT No. 00-03-00105 with several other actions challenging the same administrative determination.  These actions, however, have been voluntarily dismissed, thus rendering Bethlehem Steel and U.S. Steel the sole remaining plaintiffs.

[2] Plaintiffs initially raised a fourth claim challenging the United States' choice of "benchmark" against which to countervail long-term won-denominated loans given by the Korean government to the Korean steel industry but subsequently withdrew this appeal. (Bethlehem Steel Corporation's and U.S. Steel Group, A Unit of USX Corporation's Reply Brief, at 24.) (Plaintiffs' Reply Brief).

**STANDARD OF REVIEW**

This Court will sustain a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i) (1994). Substantial evidence is more than a "mere scintilla" of evidence. *Primary Steel, Inc. v. United States*, 834 F. Supp. 1374, 1380 (Ct. Int'l Trade 1993). It consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

**DISCUSSION**

Plaintiffs raise three major challenges to Commerce's methods and conclusions in the *Final Determination.* For clarity, specific facts pertaining to these issues, as well as the parties contentions are set forth below.

**A.      Commerce's Decisions Not to Investigate Certain Potentially Countervailable Subsidies**

Plaintiffs contend Commerce's failure to investigate two potentially countervailable subsidies renders the *Final Determination* unsupported by substantial evidence and otherwise not in accordance with law. Because the facts and legal analysis surrounding these two contentions differ, this section discusses each separately.

1.      Commerce's Decision Not to Investigate the Korean Government's Waiver and Reduction of Import Duties on the Slab Subsidy Program is Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

a.      *Background*

On July 8, 1999, Plaintiffs (then, petitioners) alleged that the Korean government had provided subsidies to the Korean steel industry through the reduction and waiver of normal import duties on steel slab – the main input into the subject merchandise.  Specifically, Plaintiffs alleged the tariff rate was lowered from eight percent to one percent during the first half of 1998 and to three percent during the second half of 1998.  The record indicates that POSCO imported slab throughout the first quarter of 1998 and that DSM imported slab during the entire year. (Plaintiffs' Brief, at 28).

On August 11, 1999, Commerce notified petitioners that it did not intend to investigate this subsidy allegation because the allegation was not made at least forty days prior to the July 26, 1999, *Preliminary Determination* as required by 19 C.F.R. § 351.301(d)(4)(i)(A).  *See* Memorandum from Team to David Mueller, Director, Office of CVD/AD Enforcement VI, dated August 11, 1999, *reprinted at*, Plaintiff's Appendix, at Tab 13; *see also, Final Determination*, 64 Fed. Reg. at 73,194-95.  Commerce further noted that it would not have investigated the allegation even it had been timely made because Plaintiffs "failed to demonstrate how a temporary reduction in a tariff rate for slab would confer a benefit upon the export of subject merchandise."  *Final Determination*, 64 Fed. Reg. at 73,195.

b.      *Contentions of the Parties*

Plaintiffs contend Commerce is statutorily obligated to investigate subsidies discovered during the course of a proceeding when those subsidies "appear to be countervailable." (Plaintiffs' Brief, at 29, *citing*, 19 U.S.C. §1677(d)).  Plaintiffs further contend the record clearly demonstrates that the slab subsidy program meets the requirements for countervailability: (1) government action; (2) benefit; and (3) specificity.

Given the apparent countervailability of the program, Plaintiffs argue Commerce was obligated to investigate their allegation – an obligation that was neither mitigated by the constraints of 19 C.F.R. §351.301(d)(4)(i)(A), nor the availability of duty drawback.  Plaintiffs argue that 19 C.F.R. §351.301(d)(4)(i)(A) not only provides Commerce with the discretion to accept allegations filed after the forty day deadline, but that the regulation has been superceded by 19 U.S.C. §1677d and 19 U.S.C. §351.311(b) (1999).  Plaintiffs point to 19 U.S.C. §1677d and argue that "the statute required Commerce to include newly discovered subsidy practices in the investigations so long as certain threshold requirements are met, regardless of the stage at which the practices are discovered." (Id. at 31.)  Similarly, Plaintiffs argue 19 C.F.R. §351.311(b) requires Commerce to include newly discovered subsidy practices within its investigation if sufficient time remains before the scheduled date for the determination." (Id.)  In the present case, Plaintiffs note that more than 170 days elapsed between the date Commerce was notified of the allegation (July 8, 1999) and the date the *Final Determination* was issued (December 29, 1999).  Accordingly, Plaintiffs argue Commerce had more than sufficient time to investigate this allegation and, therefore, its failure to do so is unsupported by substantial evidence and otherwise not in accordance with law.

The United States contends Commerce acted within its discretionary authority when it chose not to investigate the alleged slab subsidy.  Although acknowledging that Commerce is statutorily obligated to investigate subsidies discovered during the course of a proceeding, the United States argues "this obligation is tempered by the practical reality that Commerce may simply lack the resources or the time to properly investigate new subsidy allegations made late in the course of the proceeding." (Defendant's Opposition to the Motion for Judgment Upon the Agency Record Filed By Plaintiffs Bethlehem Steel Group and U.S. Steel Group, at 18.)

(Defendant's Opposition Brief.)  To address this problem, the United States argues Commerce's regulations provide that "when Commerce receives notice during the course of a proceeding of a practice that appears to provide a countervailable subsidy, but Commerce concludes that there is insufficient time to examine the practice, Commerce may defer consideration of the newly discovered practice until a subsequent administrative review." (Id., *citing*, 19 C.F.R. §351.311(c)(2) (1999)).  Further, the United States argues that 19 C.F.R. 351.401(d)(4)(i)(A) explicitly states that new subsidy allegations should be made at least forty days prior to the preliminary determination to provide Commerce with sufficient time to investigate the allegation.  (Id.)  The United States argues Commerce properly followed the terms of its regulations and that, regardless of the time between the subsidy allegation and the issuance of the *Final Determination*, Commerce's decision should be upheld. (Id.)

Finally, the United States argues that Commerce correctly decided not to investigate the alleged slab subsidy because Plaintiffs failed to demonstrate that the subsidy program was countervailable.  The United States asserts that "plaintiffs had not demonstrated how the temporary payment of reduced import duties provides a benefit when the duty paid – whatever the amount – is refunded to the company upon export of the final product." (Id.)  Commerce concluded that "[r]egardless of whether the tariff rate is one percent or eight percent the full amount of the tariff would be returned to the respondents through the duty drawback system when the imported slab is manufactured into plate and then exported as subject merchandise." (Id., at 20.)  Because Commerce is obligated to investigate only those programs that "appear to be countervailable" and because the slab subsidy program did not appear to be countervailable, the United States argues Commerce's conclusion is supported by substantial evidence and otherwise in accordance with law.

c.      *Analysis*

Commerce is statutorily obligated to investigate subsidies discovered during the course of an investigation that appear to be countervailable.  As stated, Plaintiffs alleged that the Korean government improperly provided its domestic steel industry with the benefit of a reduced import tariff on steel slab.  On its face, this allegation appears to satisfy the requirement that a party allege government action and specificity.  The United States does not challenge either of these aspects of Plaintiffs' allegation.  Rather, the United States argues Commerce determined that the tariff reductions did not confer a benefit on the Korean steel industry and, thereby, chose not to investigate the issue.

Commerce based its decision not to investigate, in part, on the conclusion that the Korean steel producers "would be" entitled to duty drawback on the imported slab when the final product was later exported.  This conclusion, however, was based on the assumption that the Korean steel producers would actually apply for and obtain duty drawback.  Nothing in the record indicates that, at the time Commerce made its decision, the Korean steel producers had applied for or obtained duty drawback on the imported slab.  It is well settled that duty drawback is not countervailable.  *See, e.g., PPG Indus. Inc.  v. United States*, 787 F. Supp. 215, 219 (Ct. Int'l Trade 1992).  The Court, however, cannot accept the United States' contention that the mere possibility of drawback renders a subsidy non-countervailable.  Although a company may have applied for and obtained duty drawback 100% of the time in past imports, there exists the possibility that in the instant case drawback might not be obtained – *i.e.* deadlines could be missed; applications could be incorrectly submitted, etc.  Similarly, although by the time the issue reaches this Court, Commerce may be able to demonstrate that the company had actually

obtained duty drawback, this *post hoc* justification cannot salvage the methodological deficiencies present in its initial determination. Accordingly, the Court finds that Plaintiffs properly alleged a subsidy that "appeared to be countervailable."

The Court is also troubled by what appears to be the cursory manner in which Commerce rejected the possibility that the reduction of import duties from eight percent to one percent or three percent provides a countervailable benefit. Even a brief examination of the facts and Plaintiffs' allegation reveals at least one possible countervailable benefit from the reduction of import tariffs even when duty drawback is available. The Korean government reduced the import tariff by at the most seven percent and at the least five percent, thereby reducing the up-front costs associated with importing steel slab. From the date of import until the date duty drawback is received, the importers arguably have the benefit of the time-value of that money. Although the Court draws no conclusions as to whether this actually constitutes a countervailable subsidy, the Court does consider it to reasonably appear countervailable and, therefore, finds that Commerce has a duty to investigate this issue. The Court suggests that on remand Commerce investigate this possibility and any others that would render the reduction of import duties countervailable.

The United States further argues Commerce was not obligated to investigate Plaintiffs' allegation because it was not raised at least forty days prior to the issuance of the preliminary determination. This Court addressed this very issue in *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000). In that case, the United States argued Commerce was not obligated to investigate a subsidy allegation because the plaintiffs failed to raise the allegation at least forty days prior to the preliminary determination. *See id.* at 1144. The plaintiffs argued that, despite the untimeliness of its allegation, Commerce was required to

investigate the allegation pursuant to 19 C.F.R. §351.311 (2000). *See id.* at 1149. The Court, in finding for the plaintiffs, distinguished between Commerce's duty to investigate a timely allegation pursuant to 19 C.F.R. 351.301(d)(4)(i)(A) and its "independent obligation to investigate potential subsidies discovered during its investigation." *Id.* at 1151. Thus, even in cases where an allegation is untimely under 19 C.F.R. §351.311, the court held Commerce bound to investigate allegations that reasonably appear to be countervailable and are discovered within a reasonable time prior to the completion of its investigation. *Id.*

As stated, 19 C.F.R. §351.311 obligation Commerce to investigate subsidy allegations discovered during an investigation if "sufficient time remains before the scheduled date for the final determination or final results of review." The Court is cognizant that this obligation may allow a petitioner who failed make a timely subsidy allegation under 19 C.F.R. 351.301(d)(4)(i)(A) to correct for its lapse in diligence by presenting the issue to Commerce at a reasonable time prior to the issuance of its final determination. "Congress, however, clearly intended that all potentially countervailable programs be investigated and catalogued, regardless of when evidence on these programs became reasonably available." *Id.*

In the present case, Commerce was made aware of the subsidy allegation in July 1999. The *Final Determination* was not issued until December 1999 thus providing Commerce with at least four full months in which to conduct its investigation. Although the Court recognizes that when Commerce is faced with unreasonably late or extraordinarily complex subsidy allegations it may "lack the resources or the time necessary to investigate" the new allegations, the present case does not implicate these concerns. The fact that Commerce had over four months to investigate what appeared to be a straightforward subsidy allegation forces the Court to conclude that Commerce's failure to so investigate was simply legal error. Accordingly, this Court finds

Commerce's decision not to investigate the Korean government's waiver and reduction of import duties on slab to be unsupported by substantial evidence and otherwise not in accordance with law. The issue is remanded to Commerce for further investigation.

2.       Commerce's Decision Not to Investigate Benefits Received by POSCO and DSM Pursuant to Article 23 of the Tax Exemption and Reduction Control Law is Supported by Substantial Evidence and Otherwise in Accordance with Law

a.       *Background*

Article 23 of the Tax Exemption and Reduction Control Law (TERCL) permits a company to include a reserve for overseas business losses in its general losses for the current taxable year. *See Notice of Initiation of Countervailing Duty Investigations: Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy and the Republic of Korea*, 64 Fed. Reg. 12,996, 13,001 (Dep't Commerce, July 26, 1999) (*Notice of Initiation*). The amount of allowable losses is limited to a fixed percentage of foreign exchange receipts from a company's overseas business. (Id.)

Plaintiffs, in their petition, alleged this program provided an export-contingent subsidy from which the Korean steel industry directly benefited. (Plaintiffs' Brief, at 45.) Commerce, however, declined to investigate this allegation because the agency had previously determined the program was not specific and, therefore, not countervailable. *See Notice of Initiation*, 64 Fed. Reg. at 13,001, *citing*, *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 Fed Reg. 37,338 (Dep't Commerce, July 9, 1993). Commerce concluded that the program was not *per se* contingent upon exportation because it was generally available to both exporters and non-exporters conducting business in another country. *See id.* at 13,001-002.

Plaintiffs repetitioned Commerce to investigate this issue arguing that "while some companies may benefit from Article 23 in a manner which is not contingent upon exportation (because of overseas business), other companies may receive a benefit wholly contingent upon exporting." (Domestic Producers Letter from Dewey Ballantine to Department of Commerce, July 8, 1999, p. 6, *reprinted at*, Plaintiffs' Appendix, Tab 11.) (Plaintiffs' July 8, 1999 Letter) To the extent that a benefit was contingent upon exports, Plaintiffs argued the subsidy was countervailable. (Id.; Plaintiffs' Brief, at 45.) Commerce again rejected Plaintiffs' petition and declined to investigate. Commerce reiterated that the benefit conferred under this program is not earned on Korean exports but, rather, from foreign receipts earned in conjunction with an overseas business. *See Final Determination*, 64 Fed. Reg. at 73,192.

> b.    *Contentions of the Parties*

Plaintiffs contend that Commerce violated its duty to investigate as set forth in 19 U.S.C. §1671a(b)(1) (1994). Under this provision, Plaintiffs assert Commerce "is required to initiate a countervailing duty proceeding when a petition is filed on behalf of the domestic industry that: (1) alleges the elements necessary for the imposition of the countervailing duty; and (2) is accompanied by information reasonably available to the petitioner supporting those allegations. Plaintiffs argue the threshold to this duty is extremely low, reflecting Congress' desire that Commerce investigates all allegations unless "it is convinced that the petition and supporting information fail to state a claim upon which relief can be granted." (Plaintiffs' Brief, at 46, *quoting*, S. REP. NO. 96-249, at 47 (1997), *reprinted in*, 1979 U.S.C.C.A.N. 381, 433.) Plaintiffs note this Court has interpreted the statute's legislative history to "imply" that, "Commerce [can] decline to initiate investigations only where they are 'clearly frivolous' or where the petitioner has not provided information reasonably available to it." (Plaintiffs' Brief, at 46, *quoting*,

*Torrington Co. v. United States*, 772 F. Supp. 1284, 1288 (Ct. Int'l Trade 1991).)  As such,

Plaintiffs urge this Court to find Commerce's refusal to investigate unsupported by substantial

evidence and otherwise not in accordance with law.

The United States contends that Plaintiffs mischaracterize the Article 23 program in that

"the program… is simply not contingent upon export performance" and "simply because a

person may have some overseas business losses that are connected to exports does not convert

the program into one that is contingent upon exports." (Defendant's Opposition Brief, at 25-26.)

Accordingly, the United States argues that Plaintiffs' contentions must fail.  (Id.)

c.     *Analysis*

Although Plaintiffs correctly cite Commerce's statutory obligation, they fail to address

this Court's holdings interpreting the scope of that obligation.  This Court has held that

"Commerce has discretion in deciding whether to reinvestigate a program previously found not

countervailable in a final agency determination in the absence of sufficient new evidence." *PPG*

*Industries, Inc. v. United States*, 787 F. Supp. 215, 220 (Ct. Int'l Trade 1992), *quoting*, *PPG*

*Industries, Inc. v. United States*, 746 F. Supp. 119, 135 (Ct. Int'l Trade 1990) (internal quotations

omitted).  Additionally, this Court has sustained Commerce's requirement that "when allegations

concern a program previously held non-countervailable… a petition [must] contain evidence of

changed circumstances or provide a sufficient basis to believe that producers receive a

disproportionate share of the benefits under these programs…" before it will begin an

investigation.  *Delverde Srl v. United States*, 989 F. Supp 218, 222 (Ct. Int'l Trade 1997),

*vacated on different grounds by*, *Delverde Srl v. United States*, 202 F.3d 1360 (Fed. Cir. 2000).

This requirement is a reasonable interpretation of Commerce's statutory obligation and is wholly

consistent with Congress' expressed intent.  Through this requirement Commerce, in essence,

has placed a burden of persuasion on petitioners and defined what constitutes a sufficient claim in cases where countervailing duties are sought after a prior determination had found an alleged subsidy to be non-countervailable.

The record does not indicate, nor do Plaintiffs argue, that Commerce was provided with evidence of sufficient weight to warrant reinvestigating the alleged subsidy. To the contrary, in their petition Plaintiffs simply stated that TERCL Article 23 is "an export incentive" and that Commerce's prior determination that the program is non-countervailable "should be abandoned." No support was provided for this bald assertion. (Plaintiffs Petition for the Imposition of Countervailing Duties, February 16, 1999, p. 86, *reprinted at*, Plaintiffs' Appendix, Tab 1.) Similarly, in its letter to Commerce asking for reconsideration of the issue, Plaintiffs simply "remind[ed] the Department" of the details contained in its initial petition. (Plaintiffs' July 9, 1999 Letter, at p. 6.) Whatever else it might be, this information is not evidence of changed circumstances, nor is it demonstrative of the Korean steel industry's disproportionate benefit under the subsidy program. Accordingly, the Court finds Commerce reasonably concluded that no new evidence existed regarding the TERCL Article 23 program and properly exercised its discretion in deciding not to reinvestigate.

**B.      Commerce's Failure to Address Certain Potentially Countervailable Subsidies**

Plaintiffs contend that Commerce's failure to address certain potentially countervailable subsidies renders the *Final Determination* unsupported by substantial evidence and not in accordance with law. (Plaintiffs' Brief, at 2-3). Specifically, Plaintiffs contend Commerce's failure to address: (1) the infrastructure subsidy benefits received by POSCO at Asan Bay; (2) the waiver or reduction of import duties on steel making equipment imported by the Korean

producers; and (3) certain benefits received by DSM relating to its purchase of land at Asan Bay, creates an inadequate record from which the Court can review the agency's decisions. (Id., at 6).

1.    Commerce's Failure to Address the Potentially Countervailable Subsidy Benefits Received by POSCO at ASAN Bay and the Potential Benefits Associated with the Reduction or Waiver of Import Duties on Steel Making Equipment is Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law

The United States does not contest Plaintiffs' contentions with respect to the potential infrastructure subsidy benefits received by POSCO at Asan Bay and the potential benefits received from the waiver or reduction of import duties on steel making equipment. To the contrary, the United States concedes that "the *Final Determination* does not explain Commerce's reasoning with respect to [these] alleged subsid[ies]" and that these issues "should be remanded to the Department so that it may explain its reasoning on remand." (Defendant's Opposition Brief, at 14, 15.)

Although Defendant United States acknowledges Commerce's failure to adequately explain its reasoning with respect to these two issues, Defendant-Intervenor argues this failure is not fatal to the *Final Determination's* validity. Defendant-Intervenor contends it is well-settled that a court may "uphold an agency's decisions of less than ideal clarity if the agency's path may be reasonably discerned." (Response Brief of Defendant-Intervenor Pohang Iron and Steel Co., Ltd., in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record, at 44) (Defendant-Intervenors Opposition Brief). Defendant-Intervenor then argues the *Final Determination* provides sufficient evidence to allow the Court to discern Commerce's reasoning. "While Commerce did not explicitly state that it found no subsidy to POSCO from the [Government of Korea's] infrastructure investments at Asan Bay, Commerce was quite clear that it was satisfied that the information requested with respect to these investigations was provided

and verified." (Id., at 45-46, *citing*, *Final Determination* 64 Fed. Reg., at 73,183.)  Additionally,

Defendant-Intervenor argues Commerce "briefly described its investigation of the alleged

infrastructure subsidies" and presented facts regarding the Korean government's infrastructure

investments at Asan Bay which "impl[y] that Commerce… did not consider… the infrastructure

investment… as relevant to its subsidy inquiry with respect to POSCO."  (Id., at 45, 46.)

The Court rejects Defendant-Intervenor's argument.  Commerce is statutorily obligated to

provide "an explanation of the basis for its determination that addresses relevant arguments made

by interested parties who are parties to the investigation… concerning the establishment of… a

countervailable subsidy."  19 U.S.C. §1677f(i)(3)(A)(1994).  The legislative history makes clear

that Congress intended Commerce to "specifically reference in [its] determinations factors and

arguments that are material and relevant or… provide a discussion or explanation in the

determination that renders evidence of the agency's treatment of a factor or argument."

Although Defendant-Intervenor is correct that courts may uphold an agency's decision where,

despite a lack of overall clarity, the path leading to its conclusion is reasonably discernable, *see*

*Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1400 (Fed. Cir. 1997), this Court

cannot discern, nor can it "imply," such a path from the brief description contained in the *Final*

*Determination*.  Accordingly, the Court remands these two issues to Commerce for further

explanation.


2.      The United States Failure to Address Certain Financial Benefits Received by
        DSM Relating to its Purchase of Land at Asan Bay is Unsupported by Substantial
        Evidence and Otherwise Not in Accordance with Law

        a.      *Background*

During the course of its investigation, Commerce discovered that the Korean government sold land at Asan Bay to DSM at a price substantially below market value. (U.S. Department of Commerce Internal Memorandum from the Team to D. Mueler, Case No. C-580-837, at 7-8, *reprinted at*, Plaintiffs' Appendix, Tab. 20). The price differential was the result of a reduction of the property's purchase price by the Korean government, as well as a waiver of certain management fees attendant to the land. *See Final Determination*, 64 Fed. Reg. at 73,184. Because these benefits were specific to DSM, Commerce calculated their value by deducting the actual purchase price from the original (market) value of the land. *See id.* The difference in amount was treated by Commerce as a "grant" from the Korean government that conveyed a 0.48% *ad valorem* countervailable subsidy to DSM. *See id.*

> b.       *Contentions of the Parties*

Plaintiffs do not challenge Commerce's methodology in calculating this subsidy, but contend Commerce improperly failed to consider an additional benefit conveyed to DSM by the Korean government. (Plaintiffs' Brief, at 22.) Upon purchase of the Asan Bay property, the Korean government refunded money to DSM. (Korean Respondent's Rebuttal Brief, Case No. C-580-837, at 52-54, *reprinted at*, Plaintiffs' Appendix, Tab 24.) This refund allegedly accounted for interest that DSM could have earned on money paid to the Korean government in advance of the Asan Bay purchase. (Id.) Plaintiffs argue that not only did DSM pay "a lesser price for the land at Asan Bay than had other purchasers, but a significant portion of the purchase price… was returned to DSM by the [Korean government] in an interest rebate to account for the time value of DSM's money." (Plaintiffs' Brief, at 21.) "To account properly for the countervailable benefit from discounted land at Asan bay, Commerce needs to… include in its calculation the refund of interest paid by the [Korean government] to DSM." (Plaintiffs' Brief,

at 23.)  Failure to do so arguably caused Commerce "to undervalue the amount of the benefit provided to DSM," therefore, "necessitating a remand for the purpose of recalculating the benefit received."  (Id.)

The United States challenges Plaintiffs' standing to raise this issue.  Specifically, the United States argues that this issue was not presented to Commerce during its investigation.  (Defendant's Opposition Brief, at 16.)  Therefore, "[P]laintiffs failed to exhaust their administrative remedies and cannot raise this issue before the Court."  (Id.)  For the Court to now entertain the issue arguably would create a situation in which the Court "improperly usurp[ed] the agency's function."  (Id. at 16).  Additionally, the United States argues that even if the issue had been raised, there would have been insufficient time for Commerce to act fully investigate it prior to issuing the *Final Determination*.  (Id.)

   c. *Analysis*

The United States is correct that, where appropriate, this Court requires a party to exhaust its administrative remedies as a prerequisite to jurisdiction.  *See* 28 U.S.C. § 2637(d) (1988).  It is well established that "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."  *See Budd Co. v. United States*, 773 F. Supp. 1549, 1554 (Ct. Int'l Trade 1991), *quoting*, *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946).

The evidence before the Court, however, clearly establishes that Plaintiffs properly placed the interest-refund issue before Commerce.  On December 3, 1999, the Korean respondents in their rebuttal brief indicated that the purchase price of the land at Asan Bay had been reduced by, *inter alia*, an amount which represented interest accrued on "advance

payments" made by DSM to the Korean government. (Plaintiffs' Reply Brief, at 7, *citing*, Korean Producers' DOC Rebuttal Brief, at 52-53, C.R. 42, P.R. 135.) On December 6, 1999, in a public hearing before Commerce, Plaintiffs explicitly raised the discount issue and asserted its countervailability. Specifically, Plaintiffs stated "DSM claims that under the Industrial Site Law [it] was entitled to a refund of interest to account for the time value of its money paid pursuant to the terms of the contract as an installment payment. That refund is a subsidy." (Public Hearing on the Countervailing Duty Investigation of Certain Cut-to-Length Steel Products from Korea, at 35, *reprinted at*, Plaintiffs Reply Brief Appendix, 13.) Throughout the investigation Plaintiffs requested that Commerce countervail the entire amount of the discount received in conjunction with the Asan Bay land purchase. Plaintiffs could not have raised the interest-refund issue any sooner because, as stated, the Korean respondents only provided the requisite information in on December 3, 1999. Upon receipt of this information, Plaintiffs timely tailored their countervailing duty request to include the interest-rebate subsidy. Accordingly, the Court finds that Plaintiffs properly placed this issue before Commerce, thereby exhausting their administrative remedies and rendering the issue proper for appeal.

The Court additionally finds the United States argument that Plaintiffs "cannot raise [the interest-rebate issue] in this proceeding" but "may raise [it] in an administrative review of the order" to be without merit. (Defendant's Opposition Brief, at 16.) The Court recognizes that 19 C.F.R. §351.311(c) grants Commerce the authority to defer consideration of certain subsidy allegations by stating "[i]f the Secretary concludes that insufficient time remains before the scheduled date for the final determination or final results of review to examine the practice, subsidy, or subsidy program… the Secretary will… (2) During an investigation or review, defer consideration of the newly discovered practice, subsidy, or subsidy program until a subsequent

administrative review, if any." This authority, however, cannot be invoked as a *post hoc*

rationalization for Commerce's actions. *See Burlington Truck Lines, Inc. v. United States*, 371

U.S. 156, 168 (1962) (finding that "courts may not accept appellate counsel's *post hoc*

rationalizations for agency's decisions."). At no point in the proceeding below did Commerce

invoke this regulation as justification for deferring consideration of this issue. Similarly, nothing

in the *Final Determination* or the record indicates that Commerce concluded this allegation was

raised too late for proper consideration. To the contrary, the *Final Determination* is silent as to

why Plaintiffs' allegations were rejected and discusses only the base methodology used to

partially countervail the Asan Bay subsidies. Accordingly, the Court cannot accept the United

States' argument and finds that Commerce's failure to address the interest-rebate subsidy in its

*Final Determination* to be unsupported by substantial evidence and otherwise not in accordance

with law. This issue is remanded to Commerce for further consideration.

**C.     Commerce's Conclusion that the Voluntary Curtailment Adjustment Did Not
         Confer a Specific Benefit is Supported by Substantial Evidence and Otherwise in
         Accordance with Law**

                    a.      *Background*

During the period of investigation the government-owned Korea Electric Power

Company (KEPCO) provided four types of discounts to its customers. *See Final Determination*,

64 Fed. Reg. at 73,182. Relevant to this case, KEPCO afforded customers the opportunity to

participate in a Voluntary Curtailment Adjustment (VCA) program. Under this program,

general, educational, or industrial users with a contract demand of 1000 kilowatts or more that

voluntarily agreed to curtail their usage by at least 20% during certain designated times were

entitled to a basic discount of 110 kilowatts per hour. *See id.* at 73,186. In their petition,

Plaintiffs alleged the Korean steel industry was, in fact, a "dominant" user of this program and

thus received a countervailable subsidy. Commerce, however, concluded that the subsidy

provided by this program was not specific and, therefore, found the VCA to be non-

countervailable. *See id.*

        b.     *Contentions of the Parties*

Plaintiffs contend Commerce improperly applied the statutory specificity test in

determining the VCA to be non-specific. Plaintiffs note that "Commerce's governing statute

details the process by which the agency is to determine whether or not a particular benefit is [*de*

*facto*] specific." (Plaintiffs' Brief, at 35.) Under the statute, a program is *de facto* specific when:

(1)     Actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number;
(2)     An enterprise or industry is a predominant user of the subsidy;
(3)     An enterprise or industry receives a disproportionately large amount of the subsidy; or
(4)     The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5)(A)(D)(iii) (1994). Plaintiffs argue "the existence of any one of these factors

necessarily warrants a finding of *de facto* specificity." (Plaintiffs' Brief, at 36.) Plaintiffs further

argue "Commerce's regulations stipulate that the agency is to engage in a sequential analysis of

these criteria and that 'if a single factor warrants a finding of specificity, the Secretary will not

undertake further analysis.'" (Id. at 36, *quoting*, 19 C.F.R. §351.502(a) (1999).) Because

Commerce's specificity analysis of the VCA program focused solely on whether the Korean

steel industry was the dominant user, Plaintiffs argue Commerce's conclusion violates 19 U.S.C.

§ 1677(5)(A)(D)(iii) and, therefore, is contrary to law. (Id. at 40.)

Additionally, Plaintiffs argue the record clearly indicates that the Korean steel industry

was not only the dominant user, but also that it received a disproportionately large amount of a

subsidy that was, in fact, granted to a very small number of recipients. (Id. at 35-37.) Based on this record evidence, Plaintiffs argue Commerce's conclusion is unsupported by substantial evidence.

The United States contends Commerce properly determined that the VCA was a generally available program and, therefore, was non-countervailable. In support of its contention, the United States argues Commerce's conclusion was consistent with a prior determination in which a similar Canadian program was found to be non-specific. (Defendant's Opposition Brief, at 21.) In *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946 (July 14, 1992), Commerce described the manner in which it analyzes energy discounts provided to large consumers of electricity. Specifically, Commerce stated "if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity, we would probably not find a countervailable duty." *Id.* at 30,950.

In the present case, the United States argues all of the VCA program participants received the same discount, thereby indicating that the rate charged was consistent. (United States' Opposition Brief, at 21.) Additionally, the United States argues that more than sixteen different industries participated in the VCA program, indicating a substantial diversity of involvement. (Id.) Finally, the United States argues that the steel industry is one of the largest industries in Korea and thus would be expected to receive the greatest amount of benefit from the VCA program. (Id.) The actual percentage of the benefit conferred upon the steel industry, therefore, was not "disproportionately" large; nor did it render the steel industry a "dominant" participant in the VCA program. As such, the United States argues that, because the terms "dominant" and

"disproportionate" are not defined in the statute, "Commerce's reasonable interpretation… is entitled to deference and should be upheld by this Court." (Id. at 22.)

   c.  *Analysis*

   The manner in which Commerce is to apply the *de facto* specificity test is clearly set forth in 19 C.F.R. §351.502(a) and has been interpreted by the courts. *See e.g., PPG Industries Inc., v. United States*, 928 F.2d 1568, 1577 (Fed. Cir. 1991); *Cabot Corp. v. United States*, 620 F. Supp. 722, 732 (Ct. Int'l Trade 1985). Commerce must on a case-by-case basis sequentially analyze each of the four factors listed in 19 U.S.C. §1677(5)(A)(D)(iii) and determine whether any of the factors is present. The *de facto* specificity test is concerned with the effect of benefits provided to individual recipients rather than on the nominal availability of benefits and, therefore, the presence of a single factor mandates a finding of *de facto* specificity. *See Cabot*, 620 F. Supp. at 732.

   A review of the record indicates, although not with crystal clarity, that Commerce engaged in such a sequential review and reasonably concluded that the VCA program was not specific. Commerce found that the "discounts provided under the VCA program were distributed to a large number of customers, across a wide range of industries." *Final Determination*, 64 Fed. Reg. at 73,186. This finding was based largely on information provided by the Korean government showing that during the period of investigation 190 customers received benefits under the VCA program and that of these companies only 31 were in the iron and steel industry. (Exhibit M-9 to the Korean Government's May 11, 1999 Questionnaire Response, *reprinted at*, United States' Appendix, Tab 2.) Additionally, the information indicates that the iron and steel industry represented only one of over sixteen industries to have received benefits under the VCA program during the period of investigation. (Id.) This information

constitutes substantial evidence supporting Commerce's conclusion that the discounts were provided to a large number of participants – a conclusion that demonstrates consideration of the first factor of the *de facto* specificity test.

Commerce next determined that "POSCO and DSM were not dominant or disproportionate users of [the VCA] program." *Final Determination*, 64 Fed. Reg. at 73,186. The United States acknowledged the "steel industry received more benefits in monetary terms pursuant to the program than any other sector in 1998," but, contrary to Plaintiffs' assertions, argues this is not determinative. (United State Opposition Brief, at 22.) The Court agrees with the United States. The mere fact that the steel industry received a greater monetary benefit from the program than did other participants is not determinative of whether that industry was "dominant" or receiving "disproportionate" benefits. In virtually every program that confers benefits based on usage levels one or more groups will receive a greater share of the benefits than another group. To impose countervailing duties on an industry where disparity alone is demonstrated, but no evidence is produced indicating that the benefit was industry specific, is anathema to the purpose of the countervailing duty laws. Although the steel industry received over 51% of the financial benefits afforded by the VCA program during the period of investigation, there is nothing in the record to indicate this percentage was disproportionately higher than would be expected. Commerce, consistent with its prior practice, examined the Korean steel industry and concluded that one of its inherent characteristics was the large consumption of electricity. Thus, when Commerce examined the Korean steel industry's electricity usage, and the attendant benefits derived from the VCA program, it found them to be neither "dominant" nor "disproportionate."

Because neither "dominant" nor "disproportionate" are defined in the relevant statute, this Court is obligated to defer to Commerce's reasonable interpretation thereof. The Court cannot find Commerce's methodology for determining a "dominant" or "disproportionate[ly]" large consumer of electricity to be unreasonable. To the contrary, it reflects the commercial realities of the industry in question. Accordingly, Commerce properly considered the second and third factors of the *de facto* specificity test.

Finally, as noted above, Commerce stated that for large consumers of electricity a countervailable subsidy will not be found if the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than similarly situated consumers. Commerce further indicated that "electricity tariffs are generally based upon the type and amount of consumption of electricity" and that typically "utility rates will not be countervailed solely because the rates are provided to large consumers." *Final Determination*, 64 Fed. Reg. at 73,192. The record indicates that under the VCA program all eligible participants receive the same discount regardless of industry. This clearly indicates uniformity of treatment among all parties and provides substantial record support for Commerce's conclusion that the VCA program was non-specific. It also demonstrates the agency properly considered the final factor of 19 U.S.C. § 1677(5)(A)(D)(iii) which requires Commerce to examine whether the administering authority has favored one industry over another in the discretionary granting of subsidies. Where, as with the VCA program, the eligibility requirements are explicitly stated and all parties receive the same discount, there can be no exercise of discretion and no favorable treatment afforded to any one industry. Accordingly, the Court finds Commerce's conclusion that the VCA program is non-countervailable to be supported by substantial evidence and otherwise in accordance with law.

**CONCLUSION**

For the reasons stated above, the Court grants Plaintiffs' motion for judgment on the agency record in part and denies the motion in part. The *Final Determination* is remanded so that Commerce may: (1) properly address the infrastructure subsidy benefits received by POSCO at Asan Bay; (2) properly address the waiver or reduction of import duties on steel making equipment imported by the Korean producers; (3) investigate the Korean government's waiver or reduction of import duties on slab; and (4) determine whether the rebate of money associated with the Asan Bay land purchase is a countervailable subsidy and, if so, to adjust the countervailing duty rate accordingly. In all other respects, the *Final Determination* is sustained as supported by substantial evidence and otherwise in accordance with law.

_____
Gregory W. Carman,
Chief Judge

Dated: April 4, 2001
      New York, NY